800 So.2d 1267 (2001)
Kimberly Arinder SANFORD, Appellant,
v.
Charles Scott ARINDER, Appellee.
No. 2000-CA-00294-COA.
Court of Appeals of Mississippi.
December 4, 2001.
*1269 Robert R. Marshall, Hattiesburg, Attorney for Appellant.
Martha Renee McBride Porter, Columbia, Attorney for Appellee.
Before McMILLIN, C.J., THOMAS, and CHANDLER, JJ.
THOMAS, J., for the Court.
¶ 1. Kimberly Arinder, the natural mother, appeals the lower court's order of custody modification which transferred custody of the two children to Charles Scott Arinder, the natural father. Kim asserts the following issues:
I. THE CHANCERY COURT DID NOT HAVE JURISDICTION OF THE PROCEEDINGS.
II. THE CHANCERY COURT DENIED KIM DUE PROCESS OF LAW.
III. CHANCELLOR THOMAS SHOULD HAVE RECUSED HIMSELF ON JULY 12, 1999 AND SET ASIDE THE ORDER OF JUNE 8, 1999.
IV. THE CHANCELLOR COMMITTED REVERSIBLE ERROR IN ORDERING A MODIFICATION OF CUSTODY.
V. THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY APPOINTING A GUARDIAN AD LITEM AND ACCEPTING THE REPORT OF THAT GUARDIAN AD LITEM.

FACTS
¶ 2. Kim and Scott were married on May 23, 1990. They had two children, Devin, born March 27, 1991, and Dustin, born May 1, 1994. Kim and Scott divorced on the grounds of irreconcilable differences on January 25, 1996. The divorce decree provided that both Kim and Scott had joint legal custody of the children, while Kim was given physical custody and Scott was given liberal visitation rights. The parties have been in continuous litigation involving visitation and custody of the children ever since. As Scott points out, there have been over fifty entries in the docket since the divorce and prior to January 1999.
¶ 3. Scott filed an amended complaint to cite for contempt and for modification of custody on January 11, 1999, and served Kim with a summons to appear and answer on February 22, 1999. Kim appeared and the matter was set for trial on April 21, 1999.
¶ 4. Some time between May 24 and May 30, 1999, and while the above mentioned matter was pending before the court, Kim moved to Guam, taking the children with her. Kim gave Scott no notice of the move. Scott was to receive alternate weeks of summer visitation with the children beginning May 30, 1999. On May 30, 1999, Scott arrived at Kim's house to find it empty. Scott called Kim's attorney and learned from her that Kim and the children had moved to Guam.
¶ 5. Scott filed a motion for emergency relief and Dawn Fulce, Kim's attorney at that time, was given notice of the motion. Fulce appeared and the matter proceeded to trial. After hearing the motion, on June 8, 1999, Chancellor Thomas granted Scott temporary custody of the children and suspended child support payments while finding Kim in contempt and ordering her to return the children to Mississippi *1270 immediately. Kim ignored this order of the court and kept the children in Guam.
¶ 6. Kim filed a motion to recuse Chancellor Thomas and set aside the June 8, 1999 order. There was a hearing on such motions on July 13, 1999, wherein both motions were denied.
¶ 7. Scott traveled to Guam and brought the matter before the appropriate court in that territory. That judge enforced the temporary custody order and delivered physical custody of the children to Scott. Scott returned to Mississippi with the children at that time.
¶ 8. Kim then returned to Mississippi and filed a complaint for writ of habeas corpus and alleged that Scott had abused the children. The court, upon Kim's motion, appointed a guardian ad litem, Sheila Smallwood. The matter was heard again on September 13, 1999, where the court heard testimony from the guardian ad litem which clearly indicated that there was no abuse. The court also held that the issue of custody was deserving of a full trial and until that time it was in the best interests of the children to remain in Scott's custody. Due to ex parte contacts from Kim and members of her family, Chancellor Thomas recused himself from the case. Kim filed a second complaint for writ of habeas corpus which was heard by Chancellor Dale. The matter proceeded to trial in December of 1999, wherein the chancellor ordered a modification of custody, giving physical custody of the children to Scott.

ANALYSIS

I. DID THE CHANCERY COURT HAVE JURISDICTION OF THE PROCEEDINGS?
¶ 9. There is nothing in the record indicating that the chancery court lacked jurisdiction during the December 1999 trial. The chancery court had personal jurisdiction because "when a divorce has been granted by a Mississippi court and the court had personal jurisdiction of the defendant at the time of the divorce that personal jurisdiction continues." Covington v. Covington, 459 So.2d 780, 781 (Miss.1984). The Mississippi Supreme Court has held that a chancery court that enters the original divorce decree has continuing jurisdiction to subsequently modify its custody order even after the parent and child have moved from the state. Bradshaw v. Bradshaw, 418 So.2d 64, 65 (Miss. 1982). Since the chancery court had personal jurisdiction over the parties, notice is all that is required for subsequent pleadings (rather than actual service of process). Covington, 459 So.2d at 782.

II. DID THE CHANCERY COURT DENY KIM DUE PROCESS OF LAW?
¶ 10. There is nothing in the record indicating that the December 1999 trial did not afford Kim due process. Kim claims that the June 8, 1999 order was announced prior to any witness testimony. There is nothing in the record to support this assertion.

III. SHOULD CHANCELLOR THOMAS HAVE RECUSED HIMSELF ON JULY 12, 1999, AND SET ASIDE THE ORDER OF JUNE 8, 1999?
¶ 11. There is nothing in the record indicating that the December 1999 trial was marred by any bias or improper contact with Chancellor Thomas. Therefore, this issue is without merit. We refuse to give way to Kim's argument that the orders and proceedings prior to the December 1999 trial prejudiced Kim in any way. The December 1999 trial was properly conducted and the holding was based on the testimony presented at that trial. However, it should also be noted that, *1271 given the unusual circumstances, Chancellor Thomas made no improper actions in his role of chancellor.
¶ 12. While ex parte communications pertaining to an open case with either party, attorney or witness is improper, the improper ex parte communications that eventually caused Thomas to recuse himself were those that Kim and members of her family initiated. For Kim to now complain of ex parte communications is a farce. A hearing was held on the motion to recuse and testimony was given which established and supported the holding that Thomas was not biased and had not had improper contact with Scott or his attorney. There is nothing in the record that indicates otherwise.

IV. DID THE CHANCELLOR COMMIT REVERSIBLE ERROR IN ORDERING A MODIFICATION OF CUSTODY?
¶ 13. In a domestic case, such as the case at hand, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied. Bland v. Bland, 620 So.2d 543, 544 (Miss.1993). In showing by the preponderance of evidence that a material change in circumstances has occurred in the custodial home, the burden of proof is on the movant. Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996).
¶ 14. In cases involving an initial award of custody, as in the case of most divorces, the chancellor is given considerable discretion so long as the chancellor follows the dictates of Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), which provides that the chancellor consider the following factors in awarding custody:
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Marital fault should not be used as a sanction in custody awards. Relative financial situations is not controlling since the duty to support is independent of the right to custody. Differences in religion, personal values and lifestyles should not be the sole basis for custody decisions.
Id.
¶ 15. In cases involving a request for modification of custody, the chancellor's duty is to determine if there has been a material change in the circumstances since the award of initial custody which has adversely affected the child and which, in the best interests of the child, requires a change in custody. Brawley v. Brawley, 734 So.2d 237 (Miss.Ct.App. 1999); Bredemeier v. Jackson, 689 So.2d 770 (Miss.1997); Bubac v. Boston, 600 So.2d 951 (Miss.1992); Phillips v. Phillips, 555 So.2d 698, 700-1 (Miss.1989); Pace v. Owens, 511 So.2d 489 (Miss.1987); Duran v. Weaver, 495 So.2d 1355 (Miss.1986); Smith v. Todd, 464 So.2d 1155 (Miss.1985); Tucker v. Tucker, 453 So.2d 1294, 1297 *1272 (Miss.1984); Marascalco v. Marascalco, 445 So.2d 1380 (Miss.1984); Kavanaugh v. Carraway, 435 So.2d 697 (Miss.1983). The application of this test as well as the use of the Albright factors in recognizing the substantial change in circumstances and the best interests of the child were most recently affirmed by this court in Thompson v. Thompson, 799 So.2d 919 (2001). Therefore, the non-custodial parent must satisfy a three part test: "a substantial change in circumstances of the custodial parent since the original custody decree, the substantial change's adverse impact on the welfare of the child, and the necessity of the custody modification for the best interest of the child." Brawley, 734 So.2d 237; Bredemeier, 689 So.2d 770; Bubac, 600 So.2d 951; Phillips, 555 So.2d at 700-1; Pace, 511 So.2d 489; Smith, 464 So.2d 1155. This Court has also noted that "the `totality of the circumstances' must be considered." Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997) (citing Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993)). Further, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. Whittington v. Whittington, 724 So.2d 922 (¶ 10) (Miss.Ct.App.1998) (citing Albright, 437 So.2d at 1005).
¶ 16. We stress that in a custody modification proceeding, the non-custodial parent's request does not simply mean a re-weighing of the Albright factors to see who now is better suited to have custody of the child. Although a re-weighing of Albright factors may be triggered, in reviewing the circumstances, there must be shown, we reiterate, a material changenot just a changein circumstances, that has had an adverse affect on the child and which requires, or mandates, a change in custody for the best interests of the child.
¶ 17. In order to clarify the type or magnitude of material changes that warrant a modification of custody, our supreme court explained that when the totality of the circumstances display a material change in the overall living conditions in which the child is found which are likely to remain changed in the foreseeable future and such change adversely affects the child, a modification of custody is legally proper. Kavanaugh, 435 So.2d at 700. The court has also stated that: "It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody." Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983). However, "an isolated incident, e.g., an unwarranted striking of a child, does not in and of itself justify a change of custody." Tucker, 453 So.2d at 1297. In Tucker, the court also made it clear that a modification of custody should never be made for the purpose of punishing or rewarding either parent. Id.
¶ 18. Plainly stated, a modification of custody is warranted in the event that the moving parent successfully shows that an application of the Albright factors reveal that there has been a material change in those circumstances which has an adverse effect on the child and a modification of custody would be in the child's best interest.
¶ 19. With this legal standard in mind, we turn to the case at hand. In order to determine whether or not the chancellor was manifestly wrong, clearly erroneous or abused his discretion in applying the custody modification test, we review the record of the proceedings in the lower court.
¶ 20. A substantial material change in the circumstances was found in Kim's capacity to provide primary child care, her mental health, as well as the stability of home environment and employment *1273 that Kim displayed. Further, the most obvious of material changes in circumstances since the original decree was Kim's abrupt relocation to Guam, a territory thousands of miles away, which was done with no notice to Scott or the proper authorities. We cite at length from the final judgment rendered by the chancellor in the lower court proceedings:
The testimony of Ben Sanford, Kim's present husband from whom she separated herself after seven or eight months of marriage, the Court deems significant. Though Kim in her testimony flatly denied any threats or acts of expressions of suicide, Ben Sanford testified at considerable length and in substantial detail as to several instances where Kim had verbally threatened suicide, and in at least one instance had come into his presence with a loaded and cocked pistol in hand with her eyes glassed over and he forcibly removed the gun from her hand. Ben testified to recurring instances of Kim being depressed and despondent in exhibited attitude, being unresponsive to his questions and suggestions and attempts to sooth her, and in many of those instances she mentioned suicide. Ben's testimony was that there were many times during their living together when Kim's behavior was "bizarre": at various times she told Ben that she had ovarian cancer, stomach cancer, or both, and one time she wrote him a note saying that it had spread and she would soon be out of his way; on at least one occasion she "trashed" the room of Ben's son, Neal, and on another occasion she took numerous personal items belonging to Neal, but the items were ultimately recovered by Kim's father returning them to Ben's home; on numerous occasions after leaving Ben she returned to his house and broke things in the house, all without rhyme or reason. Before Kim and Ben married she told Ben that she was pregnant, but after marriage this proved to be untrue. Ben testified under subpoena, not as a voluntary witness. Except for Kim's general denial of attempts or threats of suicide, Ben's testimony in detail goes without denial.
The abrupt and unannounced removal by Kim of herself and the children to the island territory of Guam, some 10,000 or more miles from the lifetime situs of herself and the children, thereby creating the tremendous barrier of distance between the children and their father, as well as both sets of grandparents and their obvious involvement in the lives of the children, is a material change of circumstances as to the custodial environment of the children and one which is adverse to their best interest and welfare. That action on the part of Kim, together with the persuading evidence of Kim's emotional instability and her demonstrated intention to place obstacles in the way of Scott's entitled visitations, leads this Court to the conclusion that, from the totality of the circumstances, the best interest and welfare of Devin and Dustin will be served by the award of their primary custody to Scott. They will thereby be placed on the continuing basis of living in an environment conducive to normal growth and maturity, surrounded by those physical things with which they are familiar, surrounded by and exposed to their extended family particularly maternal and paternal grandparents who obviously have had an active role in the care and rearing of both children. Were the children to remain with Kim in Guam would subject them to effective and possibly traumatic separation from all that which they have heretofore existed, a result which the Court is convinced would be detrimental to their normal development and their *1274 general welfare; and the Court is of the opinion that this is particularly true in view of the young age of the boys, i.e., five and eight years of age.
¶ 21. It is clear from the record that there has been a material change in the circumstances since the original decree of custody, such changes in circumstances warrant a modification of custody and it is in the children's best interests to be in Scott's custody.

V. DID THE CHANCELLOR COMMIT REVERSIBLE ERROR BY APPOINTING A GUARDIAN AD LITEM AND ACCEPTING THE REPORT OF THAT GUARDIAN AD LITEM.
¶ 22. On March 3, 1999, Kim requested that a guardian ad litem be appointed. On April 12, 1999, the chancery court ordered that appointment, naming Sheila Smallwood as guardian ad litem. The purpose of the guardian ad litem was to investigate whether there was a sufficient basis for Kim's allegations of abuse against Scott. Although the guardian ad litem was appointed due to her request, Kim now complains of the guardian ad litem and her report because the report found that Scott was not abusing the children and, thus, did not operate to her favor.
¶ 23. The Mississippi Code Annotated states that "[t]he court may investigate, hear, and make a determination in a custody action when a charge of abuse and/or neglect arises in the course of a custody action as provided in Section 43-21-151, and in such cases the court shall appoint a guardian ad litem for the child as provided under Section 43-21-121." Miss.Code Ann. § 93-5-23 (Rev.1994). The Code also states that "[t]he guardian ad litem shall investigate, make recommendations to the court or enter reports as necessary to hold paramount the child's best interest." Miss.Code Ann. § 43-21-121 (Rev. 2000). In the case at hand, the chancery court properly followed the above cited law.
¶ 24. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, LEE, IRVING, MYERS, CHANDLER and BRANTLEY, JJ., concur.